UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CARLOS DEJESUS,                                          :

                Plaintiff,                    :             10 Civ. 5522 (AJP)

         -against-                          :             **OPINION AND ORDER**

MICHAEL J. ASTRUE, Commissioner of                      :
Social Security,
                                                        :
              Defendant.
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Pro se plaintiff Carlos DeJesus brings this action pursuant to § 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner

of Social Security ("the Commissioner") denying DeJesus Disability Insurance Benefits ("DIB").

(Dkt. No. 2: Compl.)  The Commissioner has moved for judgment on the pleadings pursuant to Fed.

R. Civ. P. 12(c).  (Dkt. No. 10: Notice of Motion; see also Dkt. No. 11: Comm'r Br.)  DeJesus did

not respond to the motion.  The parties have consented to decision of this case by a Magistrate Judge

pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 7.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be GRANTED.

**FACTS**

**Procedural Background**

        On January 27, 1999, plaintiff Carlos DeJesus applied for DIB and Supplemental

Security Income ("SSI"), alleging that he had been disabled since June 5, 1991.  (See Dkt. No. 9:

Administrative Record filed by the Commissioner ("R.") at 55-57.)  DeJesus claimed that he could

not work because of back, leg, left shoulder, chest and neck pain.  (R. 5, 44, 61, 82, 91-93, 288-94, 588-89.)  The Social Security Administration awarded DeJesus SSI benefits for the period beginning December 1, 1998, but denied his DIB application because there was insufficient evidence of disability prior to September 30, 1995, the date his DIB eligibility lapsed.  (R. 34-43; see R. 21, 24, 560-61.)

DeJesus requested an administrative hearing.  (R. 44-51.)  On February 23, 2000, Administrative Law Judge ("ALJ") Michael P. Friedman held a hearing, at which DeJesus testified. (R. 15-33.)  On April 19, 2000, ALJ Friedman issued a decision finding DeJesus not disabled prior to September 30, 1995, the date he was last eligible for DIB.  (R. 7-14.)  ALJ Friedman's decision became the final decision when the Appeals Council denied DeJesus' request for review on November 27, 2001.  (R. 3-4.)

DeJesus appealed the Commissioner's decision to this Court.  (02 Civ. 0927: Dkt. No. 2: Compl.; see R. 257A-B.)  On September 10, 2002, Judge Swain approved the parties' stipulation remanding to the Social Security Administration "pursuant to sentence six of 42 U.S.C. § 405(g), for further administrative proceedings."  (02 Civ. 0927: Dkt. No. 8: Stipulation & Order; see R. 257A-60.)

On February 11, 2005, ALJ Friedman held a supplemental hearing (R. 284-96), and on April 11, 2005, he issued a written decision denying DeJesus DIB (R. 251-57).  DeJesus again appealed to this Court and again the case was remanded upon stipulation of the parties in October 2007.  (02 Civ. 0927: Dkt. No. 9: Stipulation & Order; see R. 333-34.)

On September 3, 2008, ALJ William W. Berg held a hearing at which DeJesus (appearing pro se), a medical expert and a vocational expert testified.  (R. 573-621.)  ALJ Berg held

a supplemental hearing on November 6, 2008, at which DeJesus again testified along with a second medical expert. (R. 545-72). ALJ Berg issued a written decision on December 2, 2008 finding DeJesus not disabled as of September 30, 1995. (R. 299-310). ALJ Berg's decision became the final decision on June 19, 2010, when the Appeals Council denied DeJesus' request for review. (R. 296-98.)

The issue before the Court is whether the Commissioner's decision that DeJesus was not disabled between June 5, 1991 and September 30, 1995 is supported by substantial evidence.

**<u>Non-Medical Evidence</u>**

DeJesus was born on November 7, 1949 and graduated high school in June 1968. (R. 26, 55-57, 67, 291, 577, 580-81.) Between 1972 and 1989, DeJesus worked as a state correction officer (and sergeant) performing various tasks including restraining, lifting and carrying inmates. (R. 61-62, 74-75, 81, 288, 582-84.) DeJesus spent the majority of the day on his feet, and the heaviest weight he lifted on the job was 200-300 pounds. (R. 62, 75.) DeJesus hurt his lower back and left shoulder in 1980 while restraining an inmate and again hurt his back in 1983 while breaking up a fight between two inmates. (R. 17-18, 81, 281, 584-85, 590.)

DeJesus began working as a deliveryman for UPS in 1991 and was required to walk and climb stairs with packages as heavy as 100 pounds. (R. 20, 74, 76, 288, 582.) DeJesus quit after only two months because he could not keep up with the required delivery quota, and because he experienced pain in his lower back and shortness of breath. (R. 91, 281, 288, 582.) DeJesus gained a lot of weight after he lost his correction and UPS jobs. (R. 594-95.)

DeJesus was forty-one and a half years old at the alleged onset of his disability in June 1991. (R. 55-57, 291.) DeJesus lives with his mother and has three children, ages ten, twelve

and fourteen.  (R. 23, 26, 90, 288.)  As of September 30, 1995, the date he was last insured, DeJesus estimated that he could stand for around ten minutes and walk about two blocks before getting chest pains and shortness of breath.  (R. 28, 291-92.)  DeJesus testified that he used a cane at that time, could not lift a five to ten pound grocery bag and did not do any household chores.  (R. 29, 30, 292-93.)  DeJesus passes a typical day reading, watching television and taking short walks around his neighborhood.  (R. 30-31, 90, 293.)

DeJesus testified that he became depressed when he lost his job, but did not seek medical treatment because he had no medical insurance.  (R. 21, 23, 294, 582, 589, 593.)  DeJesus could have gone to the VA for treatment, but he did not trust them.  (R. 29, 290, 294.)

**Medical Evidence Related to the June 1991 to September 30, 1995 Period**

The earliest medical evidence in the record is from DeJesus' visits to Dr. Samuel Hale between July 22, 1980 and November 18, 1980.  (R. 96, 98.)  DeJesus sprained his back while attempting to subdue an inmate.  (R. 96.)  Dr. Hale noted that x-rays of DeJesus' lumbosacral spine and pelvis were "negative in every respect," and that DeJesus had an unrestricted range of motion of his back and cervical spine.  (R. 96.)  Straight-leg raising tests also were negative.  (R. 96.)  Dr. Hale stated:  "No disability, no further treatment."  (R. 96.)

DeJesus next visited Dr. Hale on September 25-26, 1983.  (R. 99-100.)  DeJesus hurt his back again while restraining an inmate and had been out of work since September 2, 1983.  (R. 100.)  Dr. Hale diagnosed DeJesus  with "low back derangement [with] radiculitis down [the] left lower limb."  (R. 100.)[1]

---

[1]  On January 25, 1984, Dr. Hale wrote a note that DeJesus "was disabled from work today bec[ause] of slipping on ice 1/24/84 & re-injuring his lower back."  (R. 101.)

On April 23, 1992, DeJesus sought medical treatment at the Veterans Affairs Medical Center ("VAMC") (R. 278.)  DeJesus had pain in his left shoulder and occasional numbness and burning in his right upper leg exacerbated by standing for long periods.  (R. 278.)  Although x-rays showed an "essentially normal shoulder" (R. 276), DeJesus was "unable to do external rotation" and "crepitus" was observed (R. 278).  As to the right leg, DeJesus' sacroiliac joint was tender, but straight-leg tests were negative.  (R. 278.)  The VAMC doctor noted that DeJesus had a "history of l[eft] shoulder dislocation" and diagnosed him with questionable radiculopathy.  (R. 278.)  DeJesus was referred to an orthopedist for follow up care.  (R. 278.)

On May 4, 1992, DeJesus visited the orthopedic clinic at the VAMC for further examination of his left shoulder.  (R. 270.)  Anterior apprehension, relocation, and impingement tests performed on DeJesus' left shoulder were each positive and the VAMC doctor diagnosed DeJesus with anterior subluxation with a history of reconstruction and prescribed rehabilitation and nonsteroidal anti-inflammatory drugs.  (R. 270.)

On May 13, 1992, DeJesus had additional testing done on his left shoulder.  (R. 271.)  DeJesus' strength was 5/5 in all areas tested: abduction, biceps, wrists and internal and external rotation.  (R. 271.)  His left shoulder's range of motion was 155 degrees elevation, 150 degrees abduction, 55 degrees external rotation and 50 degrees internal rotation.  (R. 271.)  Sensation in the shoulder was intact and deep tendon reflexes were 2+, equal and symmetrical.  (R. 271.)  The VAMC doctor diagnosed DeJesus with anterior instability of the left shoulder and instructed him in a home exercise program.  (R. 271.)

On September 16, 1992, DeJesus again visited the VAMC because he occasionally felt that his left shoulder was dislocating, and he had pain while lying on his left side.  (R. 275.)

Although DeJesus had been strengthening his left shoulder through rehabilitation, the doctor noted that "[t]he symptoms have interfered with his ability to carry out some activities."  (R. 275.) Examination showed DeJesus had full range of motion in his shoulder and 5/5 strength, but also revealed positive impingement and apprehension signs.  (R. 275.)  DeJesus' symptoms were suggestive of recurrent anterior shoulder instability, and the doctor recommended exercise and rehabilitation.  (R. 275.)

On August 24, 1993, DeJesus went to the VAMC complaining of pain on the right side of his neck, shoulder and arm that had persisted for two days.  (R. 272.)  The doctor examined DeJesus' heart and lungs and found nothing abnormal.  (R. 272.)  However, fine papules were observed on DeJesus' right forearm and he was diagnosed with herpes zoster.  (R. 272.)  On September 7, 1993, a physician in the dermatology department noted that DeJesus' herpes was healing and prescribed Tylenol No. 3 for pain.  (R. 273.)  DeJesus followed-up at the VAMC dermatology department on September 28, 1993.  (R. 268.)  He reported that the herpes zoster was "still painful" and that he could not take Tylenol No. 3 because it contained codeine which caused heart palpitations.  (R. 268.)  The doctor prescribed Ibuprofen and referred DeJesus to the neurology department if the medication was not effective.  (R. 268.)  DeJesus visited the VAMC neurology department on November 1, 1993.  (R. 274.)  The neurologist found that DeJesus' herpes rash had healed, but that he had reduced sensation in his right arm.  (R. 274.)  The doctor diagnosed DeJesus with herpatic neuralgia and prescribed Elavil.  (R. 274.)

On April 18, 1995, DeJesus went to Metropolitan Hospital complaining of acute chest pain.  (R. 348-49.)  An x-ray of the frontal view of the chest "reveal[ed] an inadequate study."  (R.

348.)  The cardiologist determined that DeJesus had "coronary risk factors" and "felt strongly" that the assessment process begin at the medical clinic.  (R. 349.)

On May 2, 1995, a clinic doctor noted that nitroglycerin had relieved DeJesus' chest pain.  (R. 351.)  DeJesus' blood pressure was 140/80 and he was in no apparent distress.  (R. 351.)  The doctor diagnosed DeJesus with atypical chest pain and referred him for an electrocardiogram ("ECG") to rule out coronary artery disease.  (R. 351.)

On May 23, 1995, DeJesus underwent an ECG.  (R. 221.)  The test found "normal sinus rhythm with sinus arrhythmia."  (R. 221.)  Dr. Preston noted "early transition.  Increase[d] R/S ratio in VI. Consider posterior infarct."  (R. 221.)

On May 29, 1998, DeJesus was treated for chest pain at Metropolitan Hospital.  (R. 113, 239.)  Chest x-rays showed "no evidence of active disease of lung or pleura [and] [t]he heart, aorta, and hilar contours [were] normal."  (R. 113, 239.)  No bony abnormalities were observed and there were "[m]inimal degenerative changes of the thoracic spine."  (R. 113, 239.)  An ECG showed only a "normal sinus rhythm" and was described as a "normal ECG."  (R. 222.)

On February 19, 1999, DeJesus was examined by consultative physician Dr. Antonio De Leon.  (R. 117-19.)  DeJesus was able to walk without a cane, bend forward to 40 degrees, squat and walk on both the heel and ball of his feet.  (R. 118.)  DeJesus was also "[a]ble to do both fine and gross manipulations."  (R. 118.)  Chest x-rays showed "mild levoscoliosis" (R. 119) and physical examination revealed left shoulder forward elevation and abduction to 90 degrees, no back tenderness or muscle spasms and "[s]traight leg testing to 40 degrees" (R. 118).  Dr. De Leon posited that DeJesus' prognosis was fair and opined that DeJesus could sit with no limitation and could walk, stand, carry and lift with mild limitation.  (R. 119.)

On April 7, 1999, Dr. Peter Graham conducted a treadmill stress test on DeJesus. (See 123-46.) The results showed "no significant arrhythmia" and DeJesus did not experience chest pain during the test; however, Dr. Graham noted "significant ST-T Wave changes." (R. 123.)

On April 14, 1999, Dr. Ron Reynolds reviewed DeJesus' medical record and concluded that his heart condition fulfilled the requirements of the Commissioner's Listing of Impairments 4.04 ("Listing 4.04"). (R. 177; see C.F.R. Part 404, Subpart P, Appendix 1.)

DeJesus saw consultative physician Dr. Steven Rocker on June 14, 1999. (R. 149-51; see 152-73.) Dr. Rocker found that DeJesus had "no difficulty transferring from a seated position on and off the examining table[,] . . . [n]o tenderness or spasm of [the] lumbar spine [and] [f]ull range of motion of [the] lumbosacral spine." (R. 150.) Further, all of DeJesus' joints were found to have full range of motion without swelling or tenderness. (R. 150.) DeJesus underwent another treadmill stress test, which Dr. Rocker found "positive for exercise induced myocardial ischemia." (R. 150-51.) Dr. Rocker felt that this "limited [DeJesus] to sedentary work activity[,]" but noted that DeJesus' condition "could probably be markedly improved with adequate treatment." (R. 151.)

On June 22, 1999, Dr. S. Siddiqui reviewed the results of the treadmill stress test and also found it positive for myocardial ischemia. (R. 175.) Dr. Siddiqui concluded that DeJesus' heart condition met the requirements of Listing 4.04, but that "disability at 9/95 cannot be determined with [the] information contained in chart." (R. 175.)

On June 23, 1999, an agency physician reviewed DeJesus' file and completed a physical residual functional capacity assessment. (R. 179-86.) According to that assessment, as of September 30, 1995 (DeJesus' date last insured), DeJesus could sit or stand for about 6 hours in an 8-hour workday, occasionally lift up to 50 pounds, and frequently lift up to 25 pounds. (R. 180.)

Additionally, the agency physician believed that DeJesus could frequently kneel, crouch and balance, and occasionally climb ramps and stairs.  (R. 181.)

On July 6, 1999, Dr. R. F. Leeds reviewed DeJesus' medical records and concluded that DeJesus' "ECG abnormalities appear to be diagnostic of [Coronary Artery Disease] . . . and [m]eet listing 4.04A."  (R. 195.)   Dr. Leeds believed, however, that DeJesus' cardiac impairment did not begin until December 1, 1998.  (R. 195.)

Dr. Kujtim Balidemaj examined DeJesus on March 31, 2008.  (See R. 423-24.)  Dr. Balidemaj reviewed the results of a March 27, 2008 stress echocardiogram and found "normal" left ventricular systolic function and an ejection fraction of 65%.  (R. 423.)[2/]  He prescribed Plavix and scheduled a left heart catherization.  (R. 424; see also R. 347.)

**Medical Expert Testimony**

Dr. Harold Bernanke testified as a medical expert at DeJesus' September 3, 2008 DIB hearing.  (See R. 596-613.)  Dr. Bernanke opined that, on or before DeJesus' date last insured, he was not disabled due to problems with his left shoulder based on "the range and motion and the strength of that shoulder," but DeJesus would have had a limitation in his shoulder preventing him from reaching over his head, but not enough to equal a listing.  (R. 604; see also R. 601-03.)  Dr. Bernanke also believed there was insufficient evidence to conclude that DeJesus was disabled at that time due to his heart condition.  (See R. 605-13.)

---

[2/]     Medical expert Dr. Plotz testified that an ejection fraction of greater than 40% is considered normal.  (R. 564.)

Dr. Charles Plotz testified as a medical expert at DeJesus' November 6, 2008 supplemental hearing.  (See R. 548-66.)[3/]  Dr. Plotz reviewed the medical evidence of DeJesus' heart condition and concluded that DeJesus did not "develop[] detectable, discernible, distinct heart disease" until 1999.  (R. 552.)  Addressing DeJesus' May 1995 ECG, Dr. Plotz stated that if DeJesus' examining doctors "suspected anything of a more seriously disabling matter, they would have investigated it far more thoroughly than what they did in 1995."  (R. 556; see also R. 558-59, 563.)  While DeJesus had a stent in 2000 and another in April 2008, Dr. Plotz's opinion was that the coronary artery disease would not have been sufficiently severe until less than a year before 2000.  (R. 561.)

Dr. Plotz also testified that, during the period between June 1991 and September 1995, DeJesus was capable of performing light work.  (R. 556.)  Specifically, Dr. Plotz felt that DeJesus could have walked and stood for six hours in an eight-hour day, allowing for appropriate rest periods, and that he could lift and carry up to 20 pounds.  (R. 556-56A.)

**Vocational Expert Testimony**

Vocational expert Raymond Cestar testified at DeJesus' September 3, 2008 hearing. (R. 613-20.)  Cestar considered whether there were any jobs in the national and local economy that a hypothetical individual with DeJesus' age (45), education (13th grade) and residual functional capacity (lifting 10-20 pounds, walking and standing six hours in an eight hour day, no overhead reach), could perform.  (R. 615-16.)  Cestar testified that there were at least four such light exertion,

---

[3/]   Dr. Plotz also had opined on February 14, 2005 that prior to 1995, DeJesus' "only significant problem was left shoulder injury" which had been "treated surgically with improvement." (R. 279, 551.)  Dr. Plotz opined that the 1995 ECG "was basically normal - the trivial changes were not precursors of subsequent coronary artery disease as seen by later ECGs." (R. 279, 551.)

unskilled jobs:  mail clerk (71,000 jobs in the national economy), usher (117,000 jobs in the national economy), cashier (1,300,000 jobs in the national economy), or cleaner (343,000 jobs in the national economy).  (See R. 617-20.)

**The ALJ's Decision**

On December 2, 2008, ALJ Berg denied DeJesus' application for DIB in a written decision.  (R. 299-310.)  ALJ Berg reviewed DeJesus' claim of disability resulting from lumbosacral pain, left shoulder pain and chest pain, considering both his testimony and the medical record.  (R. 304-10.)

ALJ Berg found that DeJesus "did have some limitations between the alleged onset date [1991] and date last insured [1995], but not to the extent alleged."  (R. 308.)  Although DeJesus testified that he injured his back in 1980 and 1983, he continued to work as a correction officer through 1989.  (R. 308.)  Additionally, DeJesus' back and shoulder pain during the relevant period was treated "conservatively with rehabilitation and nonsteroidal anti-inflammatory drugs" and "[t]he treatment was occasional."  (R. 308.)  ALJ Berg noted that there was "no treating source that stated that [DeJesus] was unable to work between his alleged onset date and his date last insured."  (R. 308.)

ALJ Berg performed the appropriate five step legal analysis, as follows:  First, ALJ Berg found that DeJesus had not engaged in substantial gainful activity "during the period from his alleged onset date of June 6, 1991, through his date last insured of September 30, 1995."  (R. 304.)  Second, ALJ Berg found that DeJesus' shoulder, back and chest pain[4] constituted severe

---

4/      ALJ Berg noted, however, that DeJesus was not confirmed to have coronary artery disease through his date last insured, and that it did not "constitute a 'severe' impairment, as there
(continued...)

impairments.  (R. 304.)  Third, ALJ Berg determined that while DeJesus had severe impairments,

he did not have "an impairment or combination of impairments that met or medically equaled one

of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 305.)  Fourth, ALJ Berg

determined that DeJesus:

> had the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) except that he was limited to no more than occasional crawling.  He had
> to avoid climbing ladders, ropes, or scaffolds and was limited to no more than
> frequent overhead reaching and pushing and pulling with the left upper extremity.
> [DeJesus] was limited to occupations that did not require exposure to dangerous
> machinery or unprotected heights and which required no driving beyond commuting
> to and from work. Finally, he was limited to simple, routine, repetitive tasks not
> performed in a fast-paced production environment.

(R. 305.)  Based on this assessment, ALJ Berg determined that DeJesus did not have the ability to

perform any past relevant work; however, at the last step ALJ Berg found, "considering [DeJesus']

age, education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that [DeJesus] could have performed."  (R. 308.)  ALJ

Berg concluded that DeJesus was not "under a disability, as defined in the Social Security Act, at

any time from June 6, 1991, the alleged onset date, through September 30, 1995, the date last

insured" for DIB purposes.  (R. 309.)

---

4/      (...continued)
        is no evidence that it significantly limited [his] ability to perform basic work activities for
        at least twelve consecutive months during the period at issue."  (R. 305.)  ALJ Berg relied
        on DeJesus' March 27, 2008 echocardiogram showing a 65% ejection fraction, which is
        considered normal.  (R. 305.)  ALJ Berg found that "the actual functioning of [DeJesus']
        heart on and before his date last insured was unlikely to have been more than minimally
        compromised by the possible presence of any coronary artery disease."  (R. 305.)

### ANALYSIS

**I.     THE APPLICABLE LAW**

**A.     Definition of Disability**

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).[5]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[5]     See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

14

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

## B.   Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., 42 U.S.C. § 405(g); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[8/]  "'Thus, the role of the district

---

[6/]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[7/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[8/]    See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, (continued...)

court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"

Morris v. Barnhardt, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[10]   "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"

---

(...continued)
61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[9]   See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[10]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]   However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

          The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in

---

[11/]   See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

significant numbers in the national economy.   §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[12/] accord, e.g., Salmini v. Comm'r of Soc. Sec., 317 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[13/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[14/]

---

[12/]   Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003.  See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156.

[13/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[14/]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

## C.   <u>The Treating Physician Rule</u>

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); <u>see</u>, <u>e.g.</u>, <u>Meadors</u> v. <u>Astrue</u>, 370 F. App'x 179, 182 (2d Cir. 2010); <u>Colling</u> v. <u>Barnhart</u>, 254 F. App'x 87, 89 (2d Cir. 2007); <u>Lamorey</u> v. <u>Barnhart</u>, 158 F. App'x 361, 362 (2d Cir. 2006).[15/]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); <u>see</u>, <u>e.g.</u>, <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197,

---

[15/]     See also, <u>e.g.</u>, <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346 (2d Cir. 2005); <u>Tavarez</u> v. <u>Barnhart</u>, 124 F. App'x 48, 49 (2d Cir. 2005); <u>Donnelly</u> v. <u>Barnhart</u>, 105 F. App'x 306, 308 (2d Cir. 2004); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Kamerling</u> v. <u>Massanari</u>, 295 F.3d 206, 209 n.5 (2d Cir. 2002); <u>Jordan</u> v. <u>Barnhart</u>, 29 F. App'x 790, 792 (2d Cir. 2002); <u>Bond</u> v. <u>Soc. Sec. Admin.</u>, 20 F. App'x 20, 21 (2d Cir. 2001); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 78-79 (2d Cir. 1999); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

19

199 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47; Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[16/]

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II. THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE, BECAUSE DEJESUS' COMPLAINT IS CONCLUSORY AND HE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. E.g., Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("The claimant generally bears the burden of proving that she is disabled under the statute."); Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981) ("It is well established that the burden of proving disability is on the claimant."); Dousewicz v. Harris, 646 F.2d 771, 772 (2d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established . . . , namely, 'the burden of sustaining the claim for benefits is on the claimant' and '[t]he findings of the Social Security Agency are final and binding if there is a substantial basis for them.'").[17/]

---

[16/] See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

[17/] See, e.g., Harvey L. McCormick, Soc. Sec. Claims & Proc. § 14:16 (6th ed. 2009) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the (continued...)

Here, DeJesus' pro se complaint states only that he should receive DIB because of "lower back injury" sustained in 1980 and 1981, and "c[h]ronic heart d[i]sease" first diagnosed in 1999.  (Dkt. No. 2: Compl. ¶¶ 4-5.)  DeJesus has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed.  (See Dkt. Nos. 5 & 8: 9/21/10 & 10/21/10 Orders.)  Thus, DeJesus does not point to any specific testimony or evidence that he believes ALJ Berg overlooked or unjustly weighed.  DeJesus' complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings.  See, e.g., Loper v. Barnhart, No. 05-CV-6563, 2006 WL 1455480 at *2 (W.D.N.Y. May 9, 2006); Winegard v. Barnhart, No. 02-CV-6231, 2006 WL 1455479 at *9-10 (W.D.N.Y. Apr. 5, 2006); Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *3 (S.D.N.Y. Mar. 9, 2004); Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996) (Court rejects plaintiff's allegations that the ALJ failed to consider certain testimony and medical evidence on the ground that they are "broad and conclusory.  [Plaintiff] offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); Steiner v. Dowling, 914 F. Supp. 25, 28 n.1 (N.D.N.Y. 1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiff[]s – providing only a single conclusory paragraph in their Statement of Undisputed Facts, and in their Attorney's Affirmation." (record citations omitted)), aff'd, 76 F.3d 498 (2d Cir. 1996); see generally S.D.N.Y. Local Civil Rule 7.1(a) ("[A]ll motions and all oppositions thereto shall be supported by

---

[17]/   (...continued)
    burden of establishing the correctness of his or her contention.  The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure. . . ."); see also, e.g., cases cited at page 17 n.4 above.

a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion . . . .  Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.").

## III.   APPLICATION OF THE FIVE STEP SEQUENCE TO DEJESUS' CLAIMS

### A.   DeJesus Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether DeJesus was engaged in substantial gainful activity after his application for DIB.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Berg's conclusion that DeJesus had not engaged in substantial gainful activity during the applicable time period (see page 11 above) is not disputed.  The Court therefore proceeds to the second step of the five part analysis.

### B.   DeJesus Demonstrated "Severe" Physical Impairments That Significantly Limited His Ability To Do Basic Work Activities

The next step of the analysis is to determine whether DeJesus proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . "[d]ealing with changes in a routine work setting."

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

Based on the medical evidence, ALJ Berg determined that DeJesus' left shoulder, back and chest pain were severe impairments within the meaning of 20 C.F.R. § 404.1520(c). (See pages 11-12 above.) The Court therefore proceeds to the third step of the five part analysis.

### C.    DeJesus Did Not Have A Disability Listed in Appendix 1 of the Regulations

The third step of the five-part test requires a determination of whether DeJesus had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Berg found that while DeJesus' medical conditions were "severe," he did not have "an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Dkt. No. 9: R. 305; see page 12 above.)

Appendix 1 provides a categorization of physical impairments, including the musculoskeletal and cardiovascular systems.  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 4.00.

### 1.      DeJesus' Heart Condition Did Not Satisfy Appendix 1

Section 4.00 outlines certain conditions required to demonstrate a cardiovascular impairment.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00.  A cardiovascular impairment is defined as "any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage)."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(A)(1)(a).  DeJesus' heart condition would have to qualify as "Ischemic heart disease" to be considered an Appendix 1 impairment.  Ischemic heart disease is characterized by:

> symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment . . . with one of the following . . .
>
> C.  Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
>
> 1.  Angiographic evidence . . . ; and
>
> 2.  Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.04.  Section 4.00(E)(3)-(7) discusses the following symptoms due to myocardial ischemia: typical angina pectoris, atypical angina, anginal equivalent, variant angina and silent ischemia.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00.

Substantial evidence supports ALJ Berg's finding that DeJesus' heart impairment did not satisfy the listings for the relevant period, i.e., before September 30, 1995.  On April 18, 1995, DeJesus went to the hospital for chest pain, but x-rays of his chest "reveal[ed] an inadequate study."

(See pages 6-7 above.)  The cardiologist determined that DeJesus had "coronary risk factors[,]" but a May 2, 1995 evaluation at the medical clinic led to a diagnosis of atypical chest pain, not coronary artery disease.  (See page 7 above.)  Moreover, a May 23, 1995 ECG showed that DeJesus had "normal sinus rhythm with sinus arrhythmia."  (See page 7 above.)[18/]

Although DeJesus ultimately developed coronary artery disease (and received SSI benefits), medical expert Dr. Plotz testified that DeJesus did not "develop[] detectable, discernible, distinct heart disease" until 1999.  (See page 10 above.)  Addressing DeJesus' May 1995 ECG, Dr. Plotz opined that if DeJesus' examining doctors "suspected anything of a more seriously disabling matter, they would have investigated it far more thoroughly than what they did in 1995."  (See page 10 above.)  Consulting physician Dr. Leeds also concluded that DeJesus' "ECG abnormalities appear to be diagnostic of [Coronary Artery Disease]" but that DeJesus' cardiac impairment did not begin until 1998.  (See page 9 above.)

Because the medical evidence does not show that DeJesus suffered coronary artery disease during the relevant period ending September 30, 1995, his heart impairment did not qualify as ischemic heart disease, and thus substantial evidence supports the ALJ's determination (R. 304-05) that DeJesus' heart condition did not meet the requirements of the Listings.

---

[18/]    On May 29, 1998 – almost three years after the DIB period in issue – DeJesus again was treated for chest pain, but an x-ray showed "no evidence of active disease of lung or pleura [and] [t]he heart, aorta, and hilar contours [were] normal."  (See page 7 above.)  Further, a May 29, 1998 ECG also revealed  a "normal sinus rhythm[,]" and a March 27, 2008 ECG showed a normal ejection fraction.  (See pages 7, 9 above.)

## 2.   DeJesus' Shoulder Condition Does Not Satisfy Appendix 1

Section 1.02 outlines the conditions required to establish disorders of the joint.  20

C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  To constitute an Appendix 1 impairment, DeJesus' left

shoulder pain must qualify as "[m]ajor dysfunction of a joint," which is characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> . . . .
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).  "Inability to perform fine and gross

movements effectively" means

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404, Subpt. P. App. 1, § 1.00(B)(2)(c) (emphasis added).  This inability "must have

lasted, or be expected to last, for at least 12 months."  20 C.F.R., Pt. 404, Subpt. P. App. 1,

§ 1.00(B)(2)(a)

ALJ Berg's finding that DeJesus' left shoulder condition did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 306-08; see page 12 above), is supported by the medical evidence.

On April 23, 1992, DeJesus complained of left shoulder pain and doctors found he was "unable to do external rotation[,]" but x-rays showed an "essentially normal shoulder."  (See page 5 above.)  Moreover, although anterior apprehension, relocation and impingement tests performed on May 4, 1992 on DeJesus' left shoulder each were positive, treatment was conservative and consisted of rehabilitation and nonsteroidal anti-inflammatory drugs.  (See page 5 above.)

On May 13, 1992, additional testing on DeJesus' left shoulder showed that his strength was 5/5 in all areas tested: abduction, biceps, wrists and internal and external rotation.  (See page 5 above.)  DeJesus' range of motion in his left shoulder was 155 degrees elevation, 150 degrees abduction, 55 degrees external rotation and 50 degrees internal rotation.  (See page 5 above.)  DeJesus was diagnosed with anterior instability but treatment again was conservative: a home exercise program.  (See page 5 above.)

On September 16, 1992, a VAMC doctor noted that DeJesus' left shoulder "symptoms have interfered with his ability to carry out some activities[,]" but examination again showed full range of motion in DeJesus' shoulder and 5/5 strength.  (See page 6 above.)  The VA doctor recommended simple exercise and rehabilitation.  (See page 6 above.)  The record contains no other significant medical visits pertaining to DeJesus' shoulder condition after 1992.  (See pages 6-9 above.)

In February 1999, upon examination by consultative physician Dr. DeLeon, DeJesus was "[a]ble to do both fine and gross manipulations."  (See page 7 above.)

DeJesus' range of motion and strength of his shoulder, coupled with his conservative treatment history indicates that his shoulder condition did not rise to the level of "chronic joint pain and stiffness with signs of limitation of motion." (See page 25 above.)  Moreover, there is no indication that DeJesus' condition involved "one major peripheral joint in each upper extremity" or that he suffered "extreme loss of function of both upper extremities." (See page 25 above.) DeJesus' shoulder condition therefore did not qualify as a major dysfunction of the joint because it did not meet the requirements of the Listings.

ALJ Berg's finding that DeJesus' shoulder condition did not satisfy Appendix 1 is also supported by expert testimony.  Dr. Harold Bernanke, who testified as a medical expert at DeJesus' September 3, 2008 DIB hearing, opined that, on or before DeJesus' date last insured "the range and motion and the strength" of DeJesus' left shoulder suggests that  he was not disabled. (See page 9 above.)  At the November 6, 2008 supplemental hearing, Dr. Charles Plotz stated that, despite the condition of his shoulder, during the period between June 1991 and September 1995, DeJesus was capable of performing light work and could have lifted and carried up to 20 pounds. (See page 10 above.)

Accordingly, substantial evidence supports ALJ Berg's decision that DeJesus' shoulder pain did not meet the requirements of the Listings.

### 3.    DeJesus' Back Pain Does Not Satisfy Appendix 1

Section 1.04 outlines the conditions required to establish disorders of the spine.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.  Specifically, an individual must have a disorder

> (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . . .

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.   "Inability to ambulate effectively" means

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).   "To ambulate effectively,"

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

ALJ Berg's determination that DeJesus' back impairment did not satisfy the requirements of Appendix 1 is supported by substantial evidence.  Although DeJesus sprained his

back in 1980, he had unrestricted range of motion in his back, x-rays of his spine and pelvis were "negative in every respect" and straight-leg raising tests also were negative.  (See page 4 above.) DeJesus' treating physician, Dr. Hale, stated:  "No disability, no further treatment."  (See page 4 above.)  Indeed, DeJesus continued to work as a corrections officer until 1989.  (See page 3 above.) DeJesus hurt his back again in 1983 and was diagnosed with "low back derangement [with] radiculitis down [the] left lower limb[,]" but he continued to work as a corrections officer through 1989.  (See pages 3-4 above.)  DeJesus visited the VAMC again on April 23, 1992 complaining of pain in his back and leg, but straight-leg raising tests again were negative.  (See page 5 above.)

        During the relevant period, there is no evidence that DeJesus' back condition satisfied the requirements of Appendix 1: straight-leg raising tests were consistently negative and there is no evidence of "nerve root compression" or "limitation of motion of the spine."  (See pages 4-5 above.) In addition, the record does not reveal "chronic nonradicular pain and weakness" in DeJesus' back; he visited the doctor due to back pain only in isolated incidences in 1980 and 1983.  (See page 4 above.)  Furthermore, although DeJesus' testified that he used a cane, he also stated that he could walk about two blocks without pain and passed his time taking short walks around his neighborhood. (See page 4 above.)  An agency physician opined that, during the relevant period, DeJesus could sit or stand for about six hours in an eight-hour workday, occasionally lift up to 50 pounds and could frequently kneel, crouch and balance.  (See page 8 above.)  Accordingly, DeJesus did not prove that he could not "ambulate effectively" i.e. that he had an "extreme limitation of the ability to walk." (See page 28 above.)

        ALJ Berg's determination that DeJesus' back pain does not satisfy the Listings is supported by substantial evidence.

### D.    DeJesus Did Not Have the Ability to Perform His Past Work

The fourth prong of the five part analysis asks whether DeJesus had the residual functional capacity to perform his past relevant work.  (See page 16 above.)  Because DeJesus' past work as a corrections officer was performed at the "heavy exertional level[,]" ALJ Berg concluded that DeJesus was "unable to perform [his] past relevant work."  (R. 308; see page 12 above.)  This finding is not disputed, and the Court proceeds to the fifth and final step of the analysis.

### E.    DeJesus Could Perform Other Work In The Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).[19]

In meeting his burden under the fifth step, the Commissioner:

---

[19]    See also, e.g., Rosado v. Astrue, 713 F. Supp. 2d 347, 365 (S.D.N.Y. May 20, 2010) (Peck, M.J.); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *16-17  (S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *11 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Morel v. Massanari, 01 Civ. 0186, 2001 WL 776950 at *11 (S.D.N.Y. July 11, 2001) (Peck, M.J.); Vega v. Comm'r, 97 Civ. 6438, 1998 WL 255411 at *10 (S.D.N.Y. May 20, 1998) (Peck, M.J.); Pickering v. Chater, 951 F. Supp. 418, 425 (S.D.N.Y. 1996) (Batts, D.J. & Peck, M.J.);  DeJesus v. Shalala, 94 Civ. 0772, 1995 WL 812857 at *6-7 (S.D.N.Y. June 14, 1995) (Peck, M.J.), report & rec. adopted, 899  F. Supp. 1171 (S.D.N.Y. 1995).

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567(a). Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, Pt. 404 Subpt. P, App. 2, § 200.00(a).

Based on his consideration of the record, ALJ Berg determined that, during the period at issue, DeJesus:

> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he was limited to no more than occasional crawling. He had to avoid climbing ladders, ropes, or scaffolds and was limited to no more than frequent overhead reaching and pushing and pulling with the left upper extremity. [DeJesus] was limited to occupations that did not require exposure to dangerous machinery or unprotected heights and which required no driving beyond commuting to and from work. Finally, he was limited to simple, routine, repetitive tasks not performed in a fast-paced production environment.

32

(R. 305; <u>see</u> page 12 above.)  ALJ Berg's assessment was based on substantial evidence including medical records of both treating and consultative physicians, as well as the testimony of medical experts.

On June 23, 1999, an agency review physician opined that as of September 30, 1995 (DeJesus' date last insured), DeJesus could sit or stand for about six hours in an eight-hour workday, occasionally lift up to 50 pounds, and frequently lift up to 25 pounds.  (<u>See</u> page 8 above.) Additionally, the agency physician believed that DeJesus could frequently kneel, crouch and balance, occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds.  (<u>See</u> page 9 above.)  Further, Dr. De Leon opined that DeJesus could sit with no limitation and could walk, stand, carry and lift with only mild limitation.  (<u>See</u> page 7 above.)  Finally, medical expert Dr. Charles Plotz testified that during the period between June 1991 and September 1995, DeJesus was capable of performing light work:  DeJesus could have walked and stood for six hours of an eight-hour day (allowing for appropriate rest periods) and that he could lift and carry up to 20 pounds.  (<u>See</u> page 10 above.)

Using the Grid, ALJ Berg found that a person of DeJesus' age (forty-five  years old) (R. 291, 308), education (high school graduate) (R. 67), transferable skills (none) (R. 308, 615), and ability to perform light exertional work  is not disabled for purposes of Social Security benefits.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.20-.21.  (<u>See</u> R. 308.)

ALJ Berg also elicited the testimony of vocational expert Raymond Cestar.  Based on the ALJ Berg's assessment of DeJesus' functional ability, Cestar testified that there were jobs (mail clerk, usher, cashier and housekeeping cleaner) readily available in the local and national

economy that a hypothetical individual with DeJesus' age (as of his date last insured), education and residual functional capacity could perform.  (See pages 10-11 above.)[20]

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that DeJesus was not disabled within the meaning of the Social Security Act during the period June 6, 1991 through September 30, 1995 is supported by substantial evidence.[21]  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 10) is GRANTED.

SO ORDERED

Dated:      New York, New York
            April 7, 2011

            _____
            Andrew J. Peck
            United States Magistrate Judge

Copies to:   Carlos DeJesus (Regular & Certified Mail)
             A.U.S.A. Susan C. Branagan, Esq.

---

[20]   A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to  perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); De Roman v. Barnhart, 2003 WL 21511160 at *17; Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

[21]   The Court notes that the issue in this case is limited to this time period; the Commissioner granted DeJesus SSI benefits as of December 1998.